Mr. Justice Shepard
delivered the opinion of the Court:
1. Whilst the Mutual Fire Insurance Company of this controversy is not a regular private business corporation with fixed capital stock distributed among subscribers thereto and their assignees, it must nevertheless be regarded as a trading or business association in contradistinction to those that are eleemosynary. Its members are actuated by the desire of pecuniary gain. Insurance against fire is a practical necessity and their object is to procure it as cheaply as possible. They do not become members by subscription to stated and permanent capital stock, for there is none in the technical s.ense.
But they execute notes to the corporation, in amounts proportioned to the value of policies received, upon which they pay interest annually. In case of necessity to pay losses to members, each of these notes may be assessed from *160 time to time and the whole may be sued and recovered upon when necessary. Further than this, section 13 of the charter provides that the members “shall each be liable in his or her individual capacity for all debts created by said corporation in favor of persons not members thereof.” Moreover, in case of expiration or dissolution of the charter, existing members would be entitled to the same rights in the distribution of the accumulated assets that the shareholders of a regular joint stock corporation would have under the same circumstances.
2. Doubtless, in all general public meetings, as well as in those of members of private corporations, where the right to vote is not strictly personal, but representative according to some rule of government prescribed by constitution or law, the common, if not universal, practice is to elect chairmen and adopt ordinary motions and resolutions by viva voce or rising vote, where each person is counted as casting his personal vote. But uniform practice of this kind in proceedings that are formal, or wherein complete harmony of purpose prevails, will not deprive any participant of the right to demand the enforcement of the prescribed rule of voting provided the demand be made in season. Such practice and usage can not be set up to impair the obligation of an express provision of law.
3. We are of the opinion that the votes at general meetings of this corporation upon amendments of by-laws, when the rule of the charter is demanded, should not be taken per capita, but upon the representation of risks — one vote for each risk held by a member. Section 7 of the charter provides that in adopting an amendment “two-thirds of the votes shall decide.” What shall be the method of voting is not declared; but when we come to section 12, which deals with the important subject of managers, their election and duties, we find that each member shall have one vote for each risk held by him.
The adoption and amendment of by-laws that determine *161 the conduct of all the affairs of the corporation would seem as important to the interests of members in general, as the election of managers from year to year, and it is reasonable to presume that the method of voting prescribed in one case was intended to furnish the rule of the other. Considering the nature of the corporation, this presumption of intention becomes so strong that it ought not to be rebutted save by some expression to the contrary which we do not find anywhere in the act of incorporation. For, as we have seen, this corporation belongs to the class of business or trading corporations having capital stock; and in these, by general and almost universal rule, members have'votes in proportion to their interests.
4. The act of incorporation neither confers nor denies the right of members to vote by proxy; but, as we have seen, voting by proxy has prevailed for many years in the corporate elections. The right has been questioned but once, and that was in a suit between members to which some of the present litigants were parties. The bill was filed to obtain an injunction against certain managers elected at the meeting of January 17, 1898, to prevent them from interfering with the management of the corporate affairs. Their election was claimed to be illegal because of the receipt of votes cast by proxy. Archer v. Murphy, 26 Wash. Law Rep. 98. Mr. Justice Cox, who heard the cause in special term of the Supreme Court of the District, was of the opinion that this long and unbroken usage had the effect of a by-law until regularly revoked ; and dismissed the bill for that and other reasons. No appeal was taken from that dismissal. The conclusion stated was undoubtedly correct. It is the long established rule in Maryland that the existence of a valid by-law may be established by usage. Union Bank v. Ridgely, 1 H. & G. 324; Miller v. Eschback, 43 Md. 1. And the doctrine is in accord with the weight of authority elsewhere. 5 Am. & Eng. Encyc. L., p. 91, and cases cited.
*162 5. For the reason that it is not within the power of a corporation to enact by-laws in contravention of law, it is contended, on behalf of appellants, that a by-law permitting voting by proxy in elections of this corporation, whether established by record or long and uninterrupted usage, is without legal effect, because in derogation of the common law, there being no express authorization in the act of incorporation.
Now, it is true, that, at common law, for reasons which have no substantial foundation in so far as they relate to trading corporations, voting by proxy was not permitted in corporate meetings unless expressly warranted by the charter or a statute.
The appellants are hardly in a position to raise this broad question, because the resolutions adopted through their action did not abolish voting by proxy, but simply imposed limitations upon the exercise of the right. Under their own rules, proxies were recognized when executed after January 1, 1900, and presented by others than officers of the corporation. If their contention be maintainable, then the election, as held under their direction, would be irregular.
The point is in the record, however, and its determination is important to all concerned in the controversy either directly or indirectly.
The common law rule in respect of voting by proxy had its origin in reasons peculiarly applicable to the earlier forms of corporations, namely, municipal and charitable corporations. Membership in these was coupled with no pecuniary interest. The voting privilege was of the nature of a personal trust, committed to the discretion of the member as an individual, and hence not susceptible of exercise through delegation. Suffrage, and the right of representation in the elections and other affairs of the modern trading or business corporation, stand upon essentially different foundations.
*163 The stock represents property only — money as an investment — and is transferable as freely as other property. Upon the transfer of a share the transferee becomes a member in the place of the transferrer. In this corporation the transfer by one member to another of property and the policy covering it, would pass the transferrer’s right to vote —one vote for each risk — to the transferee, to be exercised by the latter in addition to any prior right he may have enjoyed.
There is sound reason in favor of, and none opposed to, permitting an owner of property of this character, as in case of other property, to act by agent in all matters affecting his interests when inconvenient to act in person.
Based on these considerations, the great weight of authority in this country sustains the proposition, that where the charter of a trading corporation is silent upon this question, the power is implied to enact a by-law conferring the right to vote by proxy. State v. Tudor, 5 Day (Conn.), 329 ; People v. Crossley, 69 Ill. 195, 197 ; Commonwealth v. Detweiler, 131 Pa. St. 614, 623, 644; Market St. Rwy. v. Hellmon, 109 Cal. 571, 598; Goddard v. Merchants’ Exchange, 9 Mo. App. 290, 295: S. C., 78 Mo. 609.
Our conclusion is that the existence of the by-law has been established by long and continuous usage, and that it is within the powers of the corporation.
6. The next question in order is, was the unquestioned power to alter, amend or repeal by-laws by a two-thirds vote regularly and legally exercised at the meeting of the members? Was the general by-law relating to proxies actually repealed or substituted by the resolutions declared adopted at that meeting, and in accordance with which the election was being held when restrained by the order of the court?
A by-law proper contemplates a permanent rule for the guidance of future action, and not a mere temporary expedient.
The resolutions under consideration were not offered as *164 by-laws or amendments thereof, and only one of them could be taken as meant for observance in future elections, namely, that denying to officers the right to act as proxies for absent members.
But assuming that they were intended to operate as regular by-laws permanently changing the practice of voting by proxy, we are of the opinion that they were not regularly and legally adopted,' and hence can not bind the protesting members.
This conclusion is the logical result of the propositions before enounced. Any member present had the right to demand a vote according to the rule of the charter — one vote for each risk.
In accordance with usage having the force and effect of a permanent by-law, all members present, whether officers or not, had the right to vote the risks of absent members whose written powers they held; said powers remaining operative as appears from their forms until actually revoked, regardless of dates of execution. Appellees demanded these rights in due season, and had they been accorded, their own votes and those which they represented would have defeated the resolutions. Had those resolutions not controlled the conduct of the election so far as held, the appellees and those acting with them would have cast a majority of the votes of members.
In view of these conclusions it is not necessary to consider at length the arguments addressed to the oppressive and unreasonable nature of the resolutions complained of.
In the first place, whilst the by-law permitting voting by proxy is a most reasonable and proper one considering the number of members and the impracticability of their meeting and acting in person, yet if regularly repealed by the requisite two-thirds vote, we are not prepared to say that such repeal would be unreasonable, in a legal sense, and opposed to common right, or that members had acquired a vested right in the privilege, under a former by-law, beyond *165 the power of recall. There are certain rights arising under by-laws that partake of the nature of contracts, and thereby become irrepealable without consent; but the right to vote by proxy would seem not to be of that kind.
A by-law requiring new proxies to be executed for each election a reasonable time before holding the same, might prove inconvenient, but that alone could not constitute unreasonableness or oppression.
A by-law prohibiting the officers of the corporation from receiving proxies and voting thereon would certainly not be unreasonable. On the contrary, from a point of view enlightened by the proceedings disclosed in this record, we are inclined to the opinion that the regular adoption of such a by-law would not only be a reasonable act, but one appropriate also as having a tendency to prevent their recurrence.
But whether by-laws are unreasonable, oppressive and destructive of common right can not altogether depend upon their substantial operation as rules of action for the future.
A by-law, whose operation might be both reasonable and convenient if made to take effect in the future, might, nevertheless, operate most vexatiously and oppressively, and be so intended to operate by its proposers, if presented without notice or warning and given immediate effect in the control of the pending meeting and election.
Mr. Justice Cole, who granted the preliminary injunction, was of the opinion that the immediate practical effect of the resolutions was unjust, unreasonable and oppressive, in that it worked the disfranchisement of a majority of the legal voters.
In arriving at the conclusion, in which we fully concur, he very aptly said:
“Some of the facts necessary to be considered in deciding the reasonableness of the amendments in question are that the right to vote for managers by proxy had been uninterruptedly exercised for more than thirty years by a very *166 large majority of the members of the company, and there had been a decision of this court affirming such right after the election in 1898. These members had given proxies expecting them to be voted at this election. Some of them 'were given to persons who were, at the time of the meeting, managers of the corporation or held other official positions therein. Proxies had been allowed to be voted at all previous meetings by such managers and officers, and without regard to the date of the proxies, so that they were couched in such terms as to authorize voting until they were revoked, as all, or certainly most, of them were, and many of which were several years old; no notice or intimation of any kind was given prior to the meeting, or at the meeting until the amendments were offered, of any intention to in any way alter, amend, or suspend the by-law in relation to voting by proxy. The persons who had given the proxies were scattered throughout the city and District, and some of them beyond the limits of the District, and very few if any were where they could be notified of the action of the meeting in time to attend personally or to give new proxies. In this situation of affairs the meeting immediately before opening the polls to receive ballots for managers passed two resolutions, one to the effect that no proxy should be voted at that meeting, which bore date prior to January 1, 1900, and the other to the effect that no member of the board of managers or any officer of the company should vote as proxy of any policyholder. The complainants held proxies representing over 9,000 votes, considerably more than a majority of all the votes in the company (which are stated to be about 15,000), all or nearly all of which 9,000 were disfranchised by these resolutions, either on the one ground or the other. No argument need be indulged in to show the unreasonableness of these resolutions.”
7. The last question for determination is, whether the foregoing conditions present a case within the jurisdiction of equity for intervention and relief.
*167 Now, when an election has been held and the result declared, it is quite clear that the proper tribunal to inquire into its validity and pronounce judgment on the conflicting titles of claimants thereunder, is a court of law. In so far as the rights of such litigants are involved, equity has no jurisdiction because the ancient remedy of the law is plain, adequate and complete.
On the other hand, it is well established that when necessary to the complete adjudication of a cause over which it has jurisdiction on independent grounds, a court of equity will inquire into and determine the validity of a corporate election as it will any other incidental question of fact or law that may arise in the course of a suit. Perry v. Tuskaloosa Cotton Seed Oil Mill, 93 Ala. 364, 373; Johnston v. Jones, 23 N. J. Eq. 216; Moses v. Tompkins, 84 Ala. 613, 617.
Its decree in such case, however, would only determine the-, validity of the election and the title to office dependent thereon in so far as they affect the substantial subject-matter of the suit. It would not extend to amotion of officers elected irregularly, unless indeed that result might be necessary to complete relief in the particular case. Johnston v. Jones, 23 N. J. Eq. 216.
The conditions of this case do not bring it directly within either of the foregoing rules. It is neither a suit to contest an election and determine title to office thereunder between contestants, nor one to enjoin elected officers from exercising the ordinary powers of corporate management on account of irregularity in their election. Nor is it a suit involving a subject-matter within the conceded jurisdiction of equity in which the validity of an election becomes the necessary subject of collateral inquiry and determination. The analogy between it and one of that nature, however, is apparently close.
The situation actually presented is this: A numerical minority of the members in personal attendance at the general meeting preliminary to the election of officers, represent *168 in person and by regular proxy the majority of the votes of the corporation according to the rule of suffrage prescribed in the charter. A numerical majority of the members, representing a minority of the legal votes, take-possession of the meeting and through an unlawful method of procedure, adopt rules to govern the conduct of the election in violation of the provisions of the charter and existing by-laws. By so doing they work the virtual disfranchisement of the majority whose votes would elect the officers proposed by them, and, unless their proceedings be stayed, will deliver the choice of those officers into the hands of the minority.
Into the motives prompting this action it is unnecessary to inquire. It was willfully and deliberately taken, and, if not arrested, would result in securing to the minority the control of the corporation and the exercise of its lucrative offices, a result impossible of achievement if the majority were permitted to vote. Pending this unlawfully conducted election the representatives of the excluded majority appealed to equity to stay it and prevent the consummation of the scheme.
Membership in this corporation, as we have seen, carries with it property interests and value, and rights of suffrage in representation of those interests, according to a fixed standard, is guaranteed by the law of incorporation.
The right, therefore, to vote in all elections involving the administration of the assets and general affairs of the corporation is important to the conservation of those interests, and constitutes a valuable right clearly cognizable in equity when threatened with destruction. The deprivation of this right, no matter what the motives inciting to it, operated as a fraud upon the appellees and those whom they represented and would work an injury for which there is no relief at law — certainly none that is at all adequate. The denial of jurisdiction and relief in such a case, upon application seasonably made, would be in opposition to the *169 fundamental maxim in which the equity jurisdiction had its origin.
The conclusion that the court below did not err in taking jurisdiction in this case and granting the restraining order and preliminary injunction accords not only with principle, as we conceive, but has the support, also, of many well considered decisions in analogous cases. Campbell v. Poulteney, 6 G. & J. 94, 102; Webb v. Ridgley, 38 Md. 364, 371; Supreme Lodge, etc., v. Simering, 88 Md. 276, 287; Schoolfield v. Union Bank, 2 Cr. C. C.115; Brown v. Pacific Mail, etc., Co., 5 Blatchf. 525, 531; Elkins v. Camden, etc., RR. Co., 36 N. J. Eq. 467: S. C. 37 N. J. Eq. 273; Archer v. American Water Works Co., 50 N. J. Eq. 33, 50; Tunis v. Pass. RR. Co., 149 Pa. St. 70, 83. In the last named case the court said that the jurisdiction of equity “ includes that of supervising and controlling the election of directors whenever it is made to appear, that, by means of fraud, violence or other unlawful conduct on the part of a portion of the corporators, a fair and honest election can not be held.” See, also, Morris v. Stevens, 178 Pa. St. 563, 579; Cannon v. Trask, L. R. 20 Eq. Gas. 669; Pender v. Lushington, L. R. 6 Ch. Div. 70, 81.
We find no error in the proceedings below, and the decree awarding the preliminary injunction will be affirmed, with costs. The cause will be remanded for further proceedings. It is so ordered. Affirmed.